J-A12028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KUWON COLSTON | : | |
| | : | |
| Appellant | : | No. 1026 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 20, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003030-2024

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KUWON COLSTON | : | |
| | : | |
| Appellant | : | No. 1027 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 20, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003037-2024

BEFORE:   LAZARUS, P.J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                 **FILED JULY 30, 2026**

Kuwan Colston appeals from the judgment of sentence,[1] entered in the

Court of Common Pleas of Philadelphia County, after he was convicted,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The judgment of sentence at issue in the instant matter was entered on
docket CP-51-CR-0003030-2024.  The trial court consolidated this case with
*(Footnote Continued Next Page)*

following a non-jury trial, of burglary and indirect criminal contempt, and sentenced to one to two years' incarceration, followed by four years' probation. Colston argues, *inter alia*, that the evidence was insufficient to support his conviction for indirect criminal contempt of a Protection from Abuse (PFA)[2] order, where he had no actual knowledge of the final PFA order in effect at the time of his arrest. He further argues that, absent such notice, he should not have been convicted of burglary, because the Commonwealth did not present sufficient evidence that he entered the premises with the intent to commit a crime therein. Because we agree that Colston did not have actual or constructive notice of the PFA and, therefore, could not be found to have violated it or intended to violate it, we reverse.

On April 7, 2024, Colston was arrested and charged with rape,[3] burglary,[4] indirect criminal contempt,[5] sexual assault,[6] criminal trespass,[7]

_____

docket CP-51-CR-0003037-2024, with notices of appeal filed on both dockets, but Colston does not challenge those convictions. **See** Appellant's Brief, at 1 n.1.

[2] **See** 23 Pa.C.S.A. § 6101 et seq.

[3] 18 Pa.C.S.A. § 3121(a)(1).

[4] **Id.** at § 3502(a)(1)(i).

[5] 23 Pa.C.S.A. § 6114(a).

[6] 18 Pa.C.S.A. § 3124.1.

[7] **Id.** at § 3503(a)(1)(ii).

indecent assault,[8] simple assault,[9] and recklessly endangering another person.[10, 11]

The case proceeded to a non-jury trial before the Honorable Deborah Cianfrani on January 10, 2025. At trial, the complainant, M.S., and Colston's arresting officer, Lindsey Schwartz, testified. The Commonwealth introduced Exhibit C-1, a packet of documents relating to temporary and final PFA orders obtained by M.S. against Colston in 2023. One of the exhibits included M.S.'s emergency petition for a PFA order, which she filed on April 20, 2023. *See* Ex. C-1, at 8–19 (unpaginated). In the section of the petition where M.S. sought specific forms of relief, she requested the court "[e]vict/exclude [Colston] from [M.S.'s] residence and prohibit [Colston] from attempting to enter any temporary or permanent residence of [M.S.]." Ex. C-1, at 16. The petition identified Colston's address as M.S.'s address at the time of the January 2025 trial. However, at trial, M.S. testified Colston was not living with her at the time she filed the petition, and she denied listing this as his address or requesting that he be evicted. *See id.* at 8; N.T. Non-Jury Trial, 1/10/25, at 10, 31–32.

---

[8] *Id.* at § 3126(a)(2).

[9] *Id.* at § 2701(a).

[10] *Id.* at § 2705.

[11] Charges of unlawful restraint and stalking were dismissed at the preliminary hearing stage.

Exhibit C-1 also included the temporary PFA order, issued *ex parte* on April 21, 2023, in response to the emergency petition. ***See*** Ex. C-1, at 20–25. The temporary order granted M.S.'s request to evict and exclude Colston from the residence and prohibited Colston from having any contact with M.S. ***See id.*** at 21. It was to remain in effect until otherwise modified or terminated by the court after notice or a hearing. ***Id.*** at 20, 23. An affidavit of service, also included in Exhibit C-1, reflected Colston was served with the temporary PFA order on April 30, 2024. ***See id.*** at 7. The notice of hearing and order listed the date for the final hearing as April 24, 2023, which was three days after the temporary order was issued and six days before it was served. ***See id.*** at 10, 11.

A final PFA order, dated May 24, 2023, was issued after a hearing, at which Colston did not appear. ***See id.*** at 1–6. The order evicted Colston from the premises (M.S.'s apartment) and prohibited him from having any contact with M.S. until May 24, 2026. ***Id.*** at 2–3. There is no certificate of service of the final PFA order in Ex. C-1, nor does the testimony reflect the final order was ever served on Colston.

At the January 10, 2025 non-jury trial, M.S. testified that she woke up in her house on April 7, 2024, and saw Colston just outside her bedroom, coming out of her bathroom. ***See*** N.T. Non-Jury Trial, 1/10/25, at 10–11. She said she asked what he was doing and why he was there. ***Id.*** at 12. When she tried to grab her phone, she testified, Colston took it from her. ***Id.*** The attorney for the Commonwealth then asked:

- 4 -

Q: [M.S.], did you have a [PFA] against Mr. Colston?

A: I did.

Q: And is that something you two had conversations about?

A: Had we [had] conversations about it?

Q: Yes.

A: Yes, in the past we did.

*Id.* at 13. The attorney for the Commonwealth then showed M.S. Exhibit C-1,[12] and asked,

Q: [D]o you recognize that?

A: I do.

Q: Is that the protection order that you had against Mr. Colston?

A: Yes, it is.

Q: Was that protection order in effect on April 7th of 2024?

A: Yes, it was.

*Id.* at 14.

M.S. testified that Colston demanded she unlock her phone, and, when she refused, began to hit her face with an open palm. *See id.* at 14–15. Eventually, she unlocked the phone, and he began to go through it and question her about its contents, striking her if he did not like her answers. *See id.* at 15. According to M.S., this conduct continued "[b]asically all through the night," for approximately four hours. *Id.* M.S. testified that

_____

[12] The packet entered as Exhibit C-1 included both the final and temporary PFA orders, though the final order came first. *See* Ex. C-1. The Commonwealth's argument assumes that the attorney showed M.S. the final order, but the record does not specifically reflect which pages she was shown. *See* Appellee's Brief, at 10–11.

Colston struck her "[m]aybe 30" times, she was in pain, and sometimes he hit her "so hard [she] fell to the floor or [her] vision would get blurry." ***Id.*** at 16; ***see also id.*** at 34. She said when she tried to leave, Colston would push her back down. ***See id.*** at 16. M.S. denied any injuries to her face or hands, which she said she used to block her face. ***See id.*** at 41–43. Officer Schwartz, who accompanied M.S. back to her apartment to arrest Colston, confirmed during her testimony that she did not observe any injuries on M.S. or marks on Colston. ***See id.*** at 60–61.

M.S. testified that Colston asked whether she wanted to have sex, pushed her down, and forcibly penetrated her. ***See id.*** at 17. She said he ejaculated on her and then into a paper towel. ***See id.*** at 18. Eventually, M.S. said, Colston fell asleep, and she drove to the police station to report the incident. ***See id.*** at 20.

Officer Schwartz testified that when M.S. reported the incident at the police station, M.S. said the perpetrator was still on location. ***See id.*** at 56–57. Therefore, they went to M.S.'s apartment together and found Colston sleeping naked in the bedroom. ***Id.*** at 58. At that point, M.S. testified, Colston was arrested. ***Id.*** at 21. After the arrest, M.S. testified, the police took M.S. to the Special Victim's Unit, where someone took her statement and she later returned for a rape kit exam. ***Id.*** at 29.

M.S. said during her testimony that she went into the apartment after the police arrested Colston to try to figure out how he got in. ***See id.*** at 23. Though there were bars on the bathroom window, she testified they were

crooked and she saw pieces of cement on the steps and ground that made it look like someone was "digging the bars out." *See id.* at 23. She said when the landlord pushed it, "it was almost like you could move it like a door." *See id.* at 24. In addition to the bars, she testified, the window was locked. *See id.* at 33.

Officer Schwartz testified that M.S. told her Colston came in through the bathroom window. *See id.* at 58. She confirmed that the bars on the window "were able to be pushed a little bit, but it left a very small space." *See id.* at 59. The trial court asked whether Officer Schwartz physically touched the window bars to see how far they went out, and Officer Schwartz said she had and it was "[n]ot far." *See id.* at 62. When the trial court requested more detail, Officer Schwartz said it was "[m]aybe a foot. It was not enough to make me feel like I could have gotten through the window and I'm pretty small." *Id.* at 62–63. Officer Schwartz did not believe the damage to the bars was recent; she said, "[I]t looked like it had been like that for a while." *See id.* at 63.

At the close of testimony, the Commonwealth entered Exhibit C-1 into evidence and marked as Commonwealth Exhibit 2 (Exhibit C-2) the sexual assault center medical records, including a DNA report. *See id.* at 66. At that point, the trial court said,

> Clearly[,] I'm not saying they didn't have intercourse. They clearly had intercourse. My question is, was it not consensual? I don't believe her. She says the same story repeatedly. I mean, within one year she's saying the exact same thing, but she was able to fight him off then. Now, all of a sudden she couldn't, and

- 7 -

then she was somehow able to fight him off, but all night long she had been held captive and she couldn't slip away until finally [she] decided that she just wanted him out because she was done with him. Sorry, but that's what it was.

My only question is the PFA[. T]hat particular charge is totally different. All the other ones I don't find her credible. I don't believe he broke in. I don't believe he went there to commit sexual assault. None of that happened. There is a PFA in place.

*Id.* at 66–67. When defense counsel argued that Colston was not present for the hearing on the final PFA, the trial court said:

That has nothing to do with it. A temporary PFA has the same effect whether it's finalized or not. He can't go in there under a temporary. You want to read it? Do you want to read what it says? I don't care if she was selling and having big neon signs saying come in, come in. He was given notice on April 30, [2]023[,] the temporary is the same as final. It has the same legal effect on him. He can't go in there and he went in there. That's the problem.

*Id.* at 67–68. Defense counsel again said Colston was entitled to notice that the PFA was finalized, and the trial court said, "You have no proof he didn't have notice." *Id.* at 68. When counsel said the Commonwealth had the burden, the trial court responded:

No, no. You have a certified PFA. Once you are given that and he doesn't show up, he is given notice of that final PFA. . . . I have no proof that he did not have the same process of why that PFA is finalized against him. And you know what, you're basically wrong [with] what you're saying because under notice that there is a temporary one, and he never received any notice that it became final, so as far as he knows the temporary one is still binding and not to go there.

*Id.* at 68–69. The Commonwealth said, "Your Honor, [] I would just point out that [] there is that situation where when you violate a PFA and you go into a residence, it becomes a burglary." *Id.* at 70. The trial court responded, "That

is a problem because I don't believe that the sexual assault happened but I do believe there's a violation of the PFA, and that does make that a crime of burglary because he had no business even when she invites him in." *Id.* at 70–71.

The trial court convicted Colston of indirect criminal contempt and, "based on that," burglary. *See id.* at 71. The court acquitted him of all other charges. On March 20, 2025, the trial court sentenced Colston to one to two years' incarceration, followed by four years' reporting probation. *See* N.T. Sentencing, 3/20/25, at 22–24. This timely appeal followed. Both the trial court and Colston have complied with Pa.R.A.P. 1925.

Colston raises the following issues for our review:

A. Was the evidence insufficient to convict [] Colston of [indirect criminal contempt] for violating a [PFA] order, where the Commonwealth failed to establish beyond a reasonable doubt that [] Colston had actual knowledge of the final PFA order that was in effect at the time of the alleged violation?

B. Was the evidence insufficient to convict [] Colston of burglary, where the Commonwealth failed to establish[,] beyond a reasonable doubt[,] that [] Colston had actual knowledge of the final PFA order that was in effect when he entered the apartment, and [indirect criminal contempt] for violating the order was the only "crime" the trial court found [] Colston intended to commit therein?

C. Assuming the Commonwealth did prove that [] Colston had actual knowledge of the final PFA order when he entered the apartment, and the evidence[,] therefore[,] was sufficient to convict him of [indirect criminal contempt], was the evidence still insufficient to convict [] Colston of burglary, because the Commonwealth failed to prove beyond a reasonable doubt that [] Colston was not licensed to enter the apartment at the time of his entry?

D. Assuming the Commonwealth proved beyond a reasonable doubt that [] Colston intended to commit [indirect criminal contempt] inside the apartment when he entered and he was not otherwise licensed to enter, was the evidence still insufficient to convict [] Colston of burglary because [indirect criminal contempt] is not a crime as that term is defined by statute?

Appellant's Brief, at 2–3.

Colston first argues that, to convict a defendant of indirect criminal contempt for violation of a PFA order, the defendant must have had actual knowledge of the order. *See* Appellant's Brief, at 15. Actual knowledge can be accomplished by service of the PFA, verbally by anyone, or by any other scenario that establishes knowledge; however, Colston claims, the Commonwealth presented no evidence to establish service, and it did not establish knowledge by other means because M.S. testified only that she and Colston "had conversations about the PFA order 'in the past'" but "never clarified when exactly these conversations occurred, nor what exactly was said during these conversations." *See id.* at 15–18. Colston argues that the trial court erred in insisting that Colston's knowledge of the temporary order and failure to attend the hearing sufficiently established actual knowledge. Instead, he claims, as a defendant, he must have "notice of the specific order or decree he is alleged to have violated," and the order he was alleged to have violated was the final order, not the temporary one. *See id.* at 19 (internal quotation marks and citation omitted). Finally, Colston contends, the fact that he knew that there was going to be a hearing to decide whether a final PFA

would be issued does not constitute actual or constructive notice of the final

PFA order itself. *See id.* at 19–21.

Our standard of review on a sufficiency claim is well-established:

[W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not [re-]weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced[,] is free to believe all, part[,] or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), quoting

*Commonwealth v. Smith*, 956 A.2d 1029, 1035–36 (Pa. Super. 2008) (en

banc).

Indirect criminal contempt under the PFA Act is governed by 23

Pa.C.S.A. § 6114(a):

**General rule.--**Where the police, sheriff[,] or the plaintiff have filed charges of indirect criminal contempt against a defendant for violation of a protection order issued under this chapter, a foreign protection order[,] or a court-approved consent agreement, the court may hold the defendant in indirect criminal contempt and punish the defendant in accordance with law.

- 11 -

*Id.* "To establish indirect criminal contempt, it must be shown that 1) the order was sufficiently clear to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act must have been one prohibited by the order; and 4) the intent of the contemnor in committing the act must have been wrongful." *Commonwealth v. Padilla*, 885 A.2d 994, 997 (Pa. Super. 2005). To find the contemnor had notice of the order, "the Commonwealth must demonstrate beyond a reasonable doubt that, at the time of the violation, the defendant had actual knowledge of the PFA order, regardless of how the defendant gained this knowledge."[13] *Commonwealth v. Stevenson*, 283 A.3d 196, 207 (Pa. 2022).

The trial court found that Colston had actual knowledge of the final order because he was served with the temporary PFA order and knew the date of the final hearing. *See* Trial Court Opinion, 8/1/25, at 5, 8–9. Thus, the court reasoned, "[n]otice can be 'presumed to be received." Specifically, the trial court noted that because the police officer served Colston with the temporary order, he had notice of the time, date, and location of the hearing. *See id.* Therefore, according to the trial court, Colston is "deemed to have 'notice' because the 'evidence within the party's knowledge was sufficient to put them on inquiry.'" *Id.* at 9, quoting *Harvilchuck v. Dep't of Env't Prot.*, 117 A.3d

_____

[13] As Colston acknowledged, notice can be properly provided: "(1) by service of the PFA order; (2) verbally from anyone, or (3) by other scenarios that can establish that the defendant had knowledge of the order." Appellant's Brief, at 15, quoting *Stevenson*, 283 A.3d at 206.

368, 373 (Pa. Cmwlth. 2015). The trial court further stated that "[f]or each step in the judicial process of the PFA Order, [Colston] was given appropriate and timely notice. Due to the fact that [Colston] had an abundance of opportunities to participate in the judicial process, this [c]ourt finds that the Commonwealth met its burden of the notice element." Trial Court Opinion, 8/1/25, at 9.

The Commonwealth also takes the position that Colston had actual knowledge but supplies a different rationale—that M.S. "testified that she had personally informed defendant about the PFA order." **See** Appellee's Brief, at 9–10, citing N.T. Non-Jury Trial, 1/10/25, at 13. The testimony the Commonwealth cites is M.S.'s statement that she "had conversations" with Colston about the referenced order "in the past." **See** N.T. Non-Jury Trial, 1/10/25, at 13. The Commonwealth alternatively suggests that "[i]nquiry notice may also potentially provide a basis for finding sufficient 'equivalent knowledge.'" Appellee's Brief, at 9, citing **Stevenson**, 283 A.3d at 208–09 (Mundy, J., concurring).

Neither the trial court's rationale nor the Commonwealth's alternative theory justify a finding that Colston had actual knowledge of the PFA, and, therefore, the trial court erred in finding the evidence sufficient to convict Colston of indirect criminal contempt. The sole case the trial court cites in

support of its "inquiry notice" theory is **Harvilchuck**, **supra**, a non-binding[14] 2015 Commonwealth Court case which **rejected** an appellant's claim that the appellee was on inquiry notice sufficient to trigger the start of a statutory limitations period. **Harvilchuck**, 117 A.3d at 373. Moreover, the trial court's theory that knowledge of a temporary PFA order—and the date and time of the hearing for a final order—is sufficient to establish notice of the entry of a final order was rejected by the Pennsylvania Supreme Court in **Stevenson**, **supra**. There, the Supreme Court held that the order of which the defendant must have actual knowledge is the PFA order **in effect at the time of the alleged violation**:

> [B]ecause a PFA order can forbid otherwise legal activity, fundamental fairness dictates that the subject of a PFA order has an interest in knowing of the existence of the order before he is punished criminally for violating it. Thus, [the Pennsylvania Supreme] Court has recognized the standard that, to prove a defendant guilty of indirect criminal contempt, the Commonwealth must establish beyond a reasonable doubt, *inter alia*, that the defendant had **notice of the order that he allegedly violated**.

**Stevenson**, 283 A.3d at 205 (emphasis added).

_____

[14] Though Commonwealth Court opinions may be persuasive, they are not binding on this Court. **See, e.g.**, **Beaston v. Ebersole**, 986 A.2d 876, 881 (Pa. Super. 2009). Notably, the sole Superior Court case **Harvilchuck** cites in its analysis of adequacy of notice, **Commonwealth v. Crockford**, 660 A.2d 1326, 1328–31 (Pa. Super. 1995), holds that the Commonwealth must prove **actual notice**, not inquiry notice, of the suspension of a defendant's license to convict the defendant of driving while under suspension, though the Commonwealth may demonstrate notice via circumstantial evidence.

As here, the defendant in **Stevenson** received notice of the temporary PFA and notice that a hearing would be held to finalize that order, and, undisputedly, "absented himself" from the hearing. **Id.** at 207. Nonetheless, the Supreme Court's determination that Stevenson had actual knowledge of the final order relied upon its finding that the defendant received notice from a third party who informed him of that order, and said, in a footnote, "To be clear, we are not holding that a defendant's knowledge of a temporary PFA order equates to the defendant knowing of a final PFA order." **Id.** at 207 n.5.[15]

---

[15] The Commonwealth cites Justice Mundy's concurrence in **Stevenson**, joined by Justice Brobson, in which Justice Mundy acknowledged the Majority's statement that knowledge of a temporary order does not establish knowledge of a final order but said she "would not rule out that [inquiry notice that a final PFA order had been issued] was alone sufficient to constitute 'equivalent knowledge' under **Commonwealth v. Stallworth**, [] 781 A.2d 110, 124 ([Pa.] 2001)." **Stevenson**, 283 A.3d at 208 (Mundy, J., concurring). She conceded, however, that the question did not need to be addressed to resolve Stevenson's case. **Id.** Thus, the discussion was dicta.

In **Stallworth**, the defendant killed a victim who had a PFA against him, and the Pennsylvania Supreme Court faced the question of whether the existence of the PFA could constitute an aggravating factor for purposes of sentencing. **Stallworth**, 283 A.3d at 123–24. The Court held that, for a defendant to be "subject to" a PFA order, he could "either be given actual notice or have the equivalent knowledge of a PFA order." **Id.** at 124. Stallworth was not served with the temporary PFA in effect at the time of the killing, and the Court considered whether conversations with other individuals amounted to equivalent knowledge. Ultimately, the Court found they did not. **See id.** at 124–26. Thus, the **Stallworth** court focused on defining the term "equivalent knowledge" but did not encounter facts similar to those presented in the instant case.

In the instant matter, Colston was served with a temporary PFA order on April 30, 2023, informing him that a temporary PFA order was entered on April 21, 2023, for which there was a scheduled hearing date on April 24, 2023—six days **before** he received notice of it. Thus, he did not have an option to appear at the only proceeding of which he was aware, and there was no evidence to suggest he was served with notice of a new hearing or the final PFA order. We can only speculate as to what he may have believed about the existence, terms, or length of a final order. Such required speculation leads us to the inevitable conclusion that the Commonwealth failed to satisfy its burden to demonstrate that Colston had actual notice of the final PFA.

The Commonwealth's theory also fails to establish actual knowledge of the final PFA order. The evidence from the testimony at trial is not, as the Commonwealth represents, that M.S. "had personally informed defendant about the PFA order." **See** Appellee's Brief, at 9. Rather, counsel for the Commonwealth asked whether the fact that M.S. received a PFA order against Colston was "something you two had conversations about," and M.S. said, "Yes, in the past we did." **See** N.T. Non-Jury Trial, 1/10/25, at 13. It may be reasonable for the Commonwealth to dismiss, as "strained and illogical," Colston's interpretation that "in the past" might mean as late as the day before the hearing. **See** Appellee's Brief, at 10. The Commonwealth also may well be correct that the law does not require the defendant be given the "precise expiration date" of the order. **See id.** at 11. The law does, however, require that the defendant be informed of the consequences of violating the operative

PFA order, *see Stevenson*, 283 A.3d at 205, and that the defendant have notice of not just the existence, but the contents of the order. *See Commonwealth v. Stallworth*, 781 A.2d 110, 124–26 (Pa. 2001).

The Court observed in *Stevenson* that, under 23 Pa.C.S.A. § 6108(g), "a final PFA order must inform the defendant that a violation of the order will lead to the defendant's arrest and possible conviction for indirect criminal contempt." *Id.* at 205. In both *Padilla* and *Stevenson*, this Court and the Supreme Court found the Commonwealth established that defendants knew of the possible consequences of violating the relevant PFA order. *See Padilla*, 885 A.2d at 996–97 (finding fact that police sergeant left defendant voicemail informing him victim obtained no-contact PFA order and "the repercussions of violating it" sufficient to constitute actual notice or its equivalent); *Stevenson*, 283 A.3d at 201–02, 207 (finding combination of testimony of victim's cousin, who told defendant about existence of PFA, and defendant's request that cousin not call police, sufficient to prove defendant had actual knowledge of PFA order). In contrast, M.S. never so much as suggested that she told Colston the possible consequences of violating the PFA order during their conversations.

Moreover, the testimony did not establish that any conversations between M.S. and Colston included information about the specifics of the final order, including the actions it prohibited or even its approximate duration. In *Stevenson*, the Supreme Court observed that notice of the contents of the order is important because a PFA "can forbid otherwise lawful activity." *See*

- 17 -

*id.* at 205. There, the victim's cousin told Stevenson not only about the existence of the PFA order, but also that he was not allowed to be at the home, and the order was to last two years. *Id.* at 199, 207. When Stevenson returned to the victim's house the following morning, the cousin reiterated that the order prevented him from coming to the home. *Id.* at 199. Similarly, in **Padilla**, the police sergeant told the defendant that the victim had a PFA order entered against him and he was to have no contact with her. **Padilla**, 885 A.2d at 996.

Notably, in **Stallworth**, the testimony about the defendant's knowledge of the PFA order bore many similarities to the instant matter. There, as here, the parties did not dispute that the order was not served on the defendant before he violated the terms of the order. **Stallworth**, 781 A.2d at 117. The Commonwealth argued that, to the extent notice was required to invoke the aggravating circumstance of violating a PFA order for sentencing purposes, Stallworth had actual notice or equivalent knowledge of the PFA because he "had knowledge that the victim had obtained some type of court order restricting his rights regarding his daughter." *Id.* at 124. The Supreme Court recounted testimony that Stallworth and his girlfriend had conversations about the order, and that Stallworth had conversations with the victim within earshot of his girlfriend, which suggested he did not understand the terms or purpose of the order. *Id.* at 124–25. The Court concluded, "While it is clear that [Stallworth] and the victim discussed court 'papers[,"] nothing in the foregoing conversations or testimony reveals that [Stallworth] was put on

notice of the contents of the PFA 'restricting in any way his behavior towards the victim.'" *Id.* at 125. The testimony regarding the "discussions" in *Stallworth* is, if anything, more detailed than the testimony regarding "conversations" in the instant matter. Nevertheless, the Court did not find they were sufficient to conclude the defendant had actual knowledge of the operative PFA order.

Based upon the foregoing, we conclude that the Commonwealth did not establish that Colston had actual knowledge of the PFA order he was alleged to have violated, and, consequently, failed to present sufficient evidence to sustain his conviction for indirect criminal contempt. Accordingly, we are constrained to reverse his conviction for indirect criminal contempt.

In his second issue, Colston argues that his burglary conviction must be reversed, since burglary requires intent to commit a crime within the premises, and he could not have had the intent to commit the crime of indirect criminal contempt without having received notice of the PFA order. *See* Appellant's Brief, at 21, 23. Colston notes the trial court stated, on the record, that it did not believe M.S.'s testimony and did not find her credible, except as to the indirect criminal contempt charge. *Id.* at 21–23 & n.10. Furthermore, he observes, the trial court acquitted him of all remaining charges besides indirect criminal contempt and burglary. *Id.* at 21–22.

The Commonwealth disputes Colston's premise, saying that for purposes of reviewing a sufficiency claim, this Court cannot consider a judge's remarks from the bench to be "findings." Appellee's Brief, at 6. Rather, it

claims that the question is whether the evidence was sufficient to support the verdict. *Id.* The Commonwealth did not need to prove Colston intended to commit any **specific** crime, and a reasonable trier of fact could have concluded from the evidence that he intended to commit **some** crime. *See id.* at 7, 13. Acquittal means only that the trier of fact entertained a reasonable doubt, and it is not a retroactive determination that the case was legally insufficient to be allowed to go to verdict in the first place. *Id.* at 7.

As Colston's second claim also sounds in sufficiency, our standard of review remains the same: "We must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Cooper*, 941 A.2d 655, 662 (Pa. 2007).

> A person commits the offense of burglary if, with the intent to commit a crime therein, the person: (1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts, or threatens to commit a bodily injury crime therein[.]

18 Pa.C.S.A. § 3502(a)(1)(i). "Thus, to prevail on a burglary charge, the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises with the contemporaneous intent of committing a crime therein, at a time when he or she was not licensed or privileged to enter." *Commonwealth v. Sanchez*, 82 A.3d 943, 973 (Pa. 2013). Intent

- 20 -

to commit a crime within the premises may be inferred from the totality of the surrounding circumstances. *See Commonwealth v. Wilamowski*, 633 A.2d 141, 143–44 (Pa. 1993); *see also Commonwealth v. Willets*, 419 A.2d 1280, 1281 (Pa. Super. 1980) ("Often, intent cannot be proven directly but must be inferred from examination of the facts and circumstances of the case.") These inferences of intent may arise from actions as well as words, but the actions "must bear a reasonable relation to the commission of a crime." *Commonwealth v. Alston*, 651 A.2d 1092, 1094 (Pa. 1994).

Finally, "to secure a conviction for burglary, the Commonwealth is not required to allege or prove what **particular** crime [the defendant] intended to commit" when the defendant forcibly entered the residence. *Id.* at 1095 (emphasis added). It is enough to demonstrate the defendant had specific intent to commit some crime, which can be shown through "a general criminal intent inferred from the totality of the circumstances of [defendant's] entry into, presence within, and flight from the private residence." *Id.*

In its Rule 1925(a) opinion, the trial court justified Colston's burglary conviction in two ways. First, it reasoned that Colston entered the residence with the intent to violate the PFA order and commit indirect criminal contempt, and this intent sufficed for the burglary conviction. *See* Trial Court Opinion, 8/1/25, at 6–7. The trial court continued:

> In addition, the evidence also establishes that [Colston] entered [M.S.]'s apartment with criminal intent. Notably, [M.S.] credibly testified that during the incident, [Colston] would not allow her to use her own mobile device, use the bathroom on her own, or have control over her body movements. From [Colston]'s conduct, it

was reasonable for the [t]rial [c]ourt to infer that [Colston] entered [M.S.]'s apartment with the intent to commit a crime therein, even if he did not ultimately follow through, or have the opportunity, to commit his intended crime. Accordingly, [Colston's] challenge is without merit, and no relief is due.

*Id.* at 7.

Absent evidence that Colston had actual knowledge of the PFA order, the trial court could not reasonably find Colston intended to commit the crime of indirect criminal contempt, because entering M.S.'s home was not, absent notice of an order to the contrary, a criminal act. Thus, the only possible source of underlying intent to support the conviction for burglary is a general intent to commit **some** crime, which, as **Alston** holds, can be "inferred from the totality of the circumstances of [defendant's] entry into, presence within, and flight from the private residence." 651 A.2d at 1095.

Contrary to the Commonwealth's contention, we do not entirely disregard a factfinder's credibility findings on a sufficiency review. **See** Appellee's Brief, at 7, 13. Rather, we account for it by taking all inferences in favor of the verdict winner. **See, e.g.**, **Commonwealth v. Miller**, 689 A.2d 238, 240 & n.2 (Pa. Super. 1997) (finding, in affirming indirect criminal contempt conviction, trial court must have concluded defendant's testimony was incredible, because trial court rejected it by convicting defendant; to extent this was request to re-weigh evidence, "we note that credibility determinations are the sole province of the fact-finder"). This case is different, however, because the facts upon which the trial court would need to rely to find that Colston entered the home with intent to commit a crime were not

those upon which the Commonwealth was the verdict winner. Rather, if anything, Colston was the verdict winner for purposes of the trial court's alternative theory, because he was acquitted of the crimes that would have required the trial court to believe M.S.'s testimony.[16]

The only remaining issue is the trial court's post hoc, *sua sponte* re-weighing of the evidence in its opinion, stating, for the first time, that it found M.S.'s testimony credible in some individual respects. At the conclusion of trial, the court unequivocally and broadly rejected M.S.'s testimony, finding it incredible. **See** N.T. Non-Jury Trial, 1/10/25, at 66–67, 68, 69–70. The court's belated contradictory statement in its Rule 1925(a) opinion is so inconsistent with its statements on the record at trial that we cannot credit it. **Compare id.** at 67–68 (trial court saying "I don't believe [M.S.]," noting she repeated same story she told year before, and citing her testimony that "all

_____

[16] To the extent the Commonwealth argues that Colston's claims are challenges to weight rather than sufficiency, we disagree. **See** Appellee's Brief, at 7 n.4. A weight claim would **challenge** a trial court's credibility determination, and Colston, in arguing that the only possible crime he was alleged to have committed was indirect criminal contempt, seeks to **credit** the trial court's credibility determination. It is not surprising that Colston did not seek to reverse the court's credibility determination on appeal—presumably, he agrees with the court's evaluation that M.S. lacked credibility and would, therefore, not assert it was erroneous. Thus, Colston's claim is, in practical terms, a reverse weight claim—an effort to affirm the trial court's exercise of the precise function for which we grant it the greatest deference. We repeatedly affirm that the credibility of witnesses is the sole province of the trial court, and we are in no position to re-weigh it on appeal. **See, e.g.**, **Commonwealth v. Peralta**, 311 A.3d 1, 4 (Pa. Super. 2024); **Commonwealth v. Randall**, 758 A.2d 669, 674 (Pa. Super. 2000) (collecting cases). That is no less true here.

night long she had been held captive and she couldn't just slip away until [she] finally decided that she just wanted him out because she was done with him;" trial court saying PFA charge is "totally different," but "all the other ones I don't find her credible. **I don't believe he broke in. I don't believe he went there to commit sexual assault. None of that happened.**") (emphasis added) *with* Trial Court Opinion, 8/1/25, at 7 (finding M.S. "credibly" testified about not being allowed to use her cell phone, go to the bathroom alone, "or have control over her body movements," all of which allowed the trial court to infer that Colston entered the apartment with the intent to commit a crime). The trial court now attempts to justify its verdict on the burglary charge by referring to testimony it, itself, discredited. To affirm the burglary conviction would perversely require that we overturn the trial court's explicit, on-the-record credibility findings that it now, without stated reason, disavows.

If we discount M.S.'s testimony, as the trial court did at trial, we have no basis to find Colston intended to commit any crime inside the premises. Even applying a generous totality of the circumstances test, Colston's presence in the home and possible sexual intercourse with M.S. are insufficient to demonstrate Colston intended to commit a crime.

In light of our disposition, we need not address Colston's third and fourth claims.

Judgments of sentence reversed. Jurisdiction relinquished.

Stevens, P.J.E., join the Memorandum.

Sullivan, J., Concurs in the Result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/30/2026